## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                    No. 23-CR-01224-DHU

PATRIC HYLER-WILLIAMS and
LEO BERRY,

    Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>
## <u>ON MOTIONS TO SUPPRESS</u>

This matter is before the Court on Defendants' Joint Opposed Motion to Suppress (Doc. 84) and Defendant Leo Berry's Motion to Suppress Evidence (Doc. 85). The Government filed one response to Defendants' motions, noting that "[e]ach defendant has joined in the other's motion and the issues presented are, while not identical, all closely related to the same traffic stop." (Doc. 91 at 1). The Court held an evidentiary hearing on the motions on October 23, 2024 (Doc. 108) ("Motion Hearing").

Having considered the briefs, record evidence, hearing testimony, arguments, relevant law, and being otherwise fully informed, the Court concludes that both Defendants' Joint Opposed Motion to Suppress (Doc. 84) and Defendant Leo Berry's Motion to Suppress Evidence (Doc. 85) must be GRANTED.

## I.
## BACKGROUND

On Tuesday, August 1, 2023, Bureau of Indian Affairs ("BIA") Officer Nicholas Jackson was conducting traffic enforcement on the eastbound lanes of Interstate 40 near mile marker 117 within Laguna Pueblo, New Mexico. October 23, 2024 Motion Hearing Transcript ("Mot. Hr'g

1

Tr.") at 18:6-12.[1] At approximately 6:00 p.m. or shortly thereafter, Officer Jackson conducted a traffic stop of a gray Jeep Wagoneer which was occupied by Defendant Patric Hyler-Williams, who was driving the vehicle, and Defendant Leo Berry, a passenger. Officer Jackson initiated the stop by turning on his emergency lights, which turned on his dash camera recorder,[2] and the Wagoneer pulled over without incident. *Id.* at 34:18-23.

Once the Wagoneer had come to a full stop on the shoulder of the highway, Officer Jackson stepped out of his police vehicle and walked behind and then to the right of the Wagoneer to the front passenger window of the vehicle. DC at 1:22-28. Upon reaching the front passenger window, Officer Jackson asked the driver, Defendant Hyler-Williams, for his driver's license, registration, and insurance for the Wagoneer. *Id.* at 1:43; Mot. Hr'g Tr. at 39:7-10; 40:22-25. The officer testified at the Motion Hearing that he believes the driver provided his license and a rental agreement. Mot. Hr'g Tr. at 39:12-14. After reviewing the documentation, Officer Jackson told Hyler-Williams and the passenger, Berry, that they needed to keep their distance from other vehicles while driving, that he was going to give them a warning, and that the way he conducted his interviews and issued warnings was to do it from his vehicle. DC at 2:51-3:15. Officer Jackson then directed Hyler-Williams to get out of the Wagoneer and go back to his vehicle with him to complete the warning. *Id.* at 3:20. Hyler-Williams complied with the officer's request and got out of the Wagoneer. *Id.* at 3:25. The two then went back to Officer Jackson's police vehicle. *Id.* at

---

[1]  This Memorandum Opinion and Order cites to the court reporter's unofficial transcript of the Motion Hearing as "Mot. Hr'g Tr. at page:line(s)." Page citations are subject to change on the official, edited version of the transcript.

[2]  The dash camera recorder on Officer Jackson's vehicle recorded both video and audio for approximately one hour and ten minutes, which began from the time Officer Jackson pulled behind the Wagoneer driven by Defendants until the time the arrest of Defendants was completed. Citations to the dash camera recording are "DC," followed by minute:seconds displayed on the video recording.

3:41. Officer Jackson and Hyler-Williams sat in the front seats of the officer's vehicle while the officer went through the process of issuing the written warning to Hyler-Williams. Officer Jackson testified at the hearing that, as they sat in the vehicle, he also checked for potential warrants for Hyler-Williams and the status of his driver's license. Mot. Hr'g Tr. at 39:24-40:4. As the two talked, Officer Jackson asked Hyler-Williams where he and his passenger were headed, and Hyler-Williams responded that they were going back home. DC at 4:00. Officer Jackson noted that as he was checking the status of Hyler-Williams' driver's license, Hyler-Williams volunteered that his license was not good and that he and Berry had just switched seats because Berry was tired. *Id.* at 4:20. For the next several minutes, as Officer Jackson continued the process of issuing the warning, the two talked about the reason Hyler-Williams' license had been suspended, how Hyler-Williams and Berry had come out to Arizona to see family and friends, and the hot weather in Arizona. *Id.* at 4:20-9:00. At some point, Officer Jackson checked the status of Berry's license and stated it was good and recommended that the two could just swap seats on the rest of their drive back home. *Id.* As he worked on the written warning, Officer Jackson asked Hyler-Williams for his social security number, weight and hair color, and asked what Hyler-Williams and Berry did for a living and what they did in Arizona. *Id.* at 9:00-11:30.

Approximately twelve and a half minutes after Officer Jackson first stopped Defendants, he completed the written warning and explained to Hyler-Williams that it was for following to close and for speeding. *Id.* at 12:30. He asked Hyler-Williams to read and sign the warning, which Hyler-Williams did, and then the officer offered Defendant a copy of the warning, stating that he was going to go and explain to Berry what was going on. *Id.* at 12:30-13:00.

At this point in time, after the warning had been issued and signed but before the officer allowed Hyler-Williams to leave the police vehicle, Officer Jackson mentioned, for the first time, that he had smelled marijuana in the Wagoneer, stating:

> Real quick though man. There is an odor of marijuana in the vehicle. You're in New Mexico, we're also recreational just like Arizona. So you are allowed to have marijuana in the vehicle. With the odor being detected, do you have any more marijuana in the vehicle?

*Id.* at 13:00. Hyler-Williams denied having marijuana and stated, "that was back in Arizona." *Id.* at 13:15. Officer Jackson then asked if there was any luggage in the vehicle and Hyler-Williams confirmed that there was. *Id.* at 13:20-13:22. Officer Jackson then asked for consent to search the vehicle, but Hyler-Williams declined, stating that the officer should ask Berry, the person who had rented the vehicle. *Id.* Officer Jackson then asked Hyler-Williams for permission to search his bags, and Hyler-Williams responded that he had no bags. Upon further questioning, Hyler-Williams stated that all he had was a plastic bag with dirty clothes in it and that it was in the back of the Wagoneer. *Id.* at 13:22-13:55.

Officer Jackson and Hyler-Williams then got out of the police vehicle and Officer Jackson directed Hyler-Williams to stand by the vehicle. *Id.* at 13:56-13:59. As Hyler-Williams stood by the police vehicle, Officer Jackson asked him if he had any weapons on him and Hyler-Williams indicated he did not. *Id.* at 13:59-14:00. The officer quickly patted Hyler-Williams' waistband and then walked to the front passenger window to speak with Berry, who was still sitting in the front passenger seat of the Wagoneer. *Id.* at 14:04-14:08. Officer Jackson asked Berry to extinguish his cigarette and exit the vehicle and Berry complied. *Id.* at 14:09-14:19. Officer Jackson also asked Berry if had any weapons on him, to which Berry responded that he did not. *Id.* at 14:19-14:21. The officer then patted Berry's waistband area. *Id.* at 14:21-14:23. As they stood outside the Wagoneer, Officer Jackson asked Berry what he and Hyler-Williams were doing in Arizona, how

long they had been out there, and what relationship they had with each other. *Id.* at 14:30-15:10. Officer Jackson also mentioned that in New Mexico, recreational marijuana was legal. *Id.* Berry responded to the officer by stating that they got out to Arizona "a week ago . . . we've been out there about four days." *Id.* Berry also told the officer that he and Hyler-Williams were cousins, that the purpose of the trip was to see family at a reunion, and that there was no marijuana in the vehicle. *Id.* Officer Jackson then asked for permission to search the vehicle and Berry declined. *Id.* at 15:08-15:12. The officer then told Berry that he had probable cause to search the vehicle based on the odor of marijuana. *Id.* The officer directed Berry to put his phone inside the vehicle, to stand on the shoulder of the highway, and asked for the keys to the Wagoneer, which Berry gave to him. *Id.* at 15:12-16:08. Officer Jackson then walked back to where Hyler-Williams was standing (near the front of the police vehicle) and directed him to stand further away on the shoulder of the highway, informing him that if he tried to run, he would release his dog, which was in the back of the officer's police vehicle. The officer then walked back to where Berry was and told him to stand even further away, also informing him that he had a dog and that if he tried to run, he would release the dog on him. *Id.* at 16:05-16:40.

After he had secured both Hyler-Williams and Berry on the shoulder of the highway, Officer Jackson walked directly to the rear hatch of the Wagoneer, opened it with the key FOB for the vehicle, and began searching a plastic bag which appeared to be filled with clothes. *Id.* at 16:40-19:49. He then searched the contents of a suitcase, a backpack, and another plastic bag. *Id.* Finding nothing in those items, Officer Jackson then searched the spare tire compartment and began to check the plastic trim of the rear hatch and the rear hatch door, using an upholstery tool to remove panels from the vehicle. *Id.*; Mot. Hr'g Tr. at 66:13-22. Finding no contraband in the rear hatch area of the vehicle, Officer Jackson then moved to the driver's side of the Wagoneer and began

searching the third-row seat of the vehicle. *Id.* at 16:49- 20:45. The dash camera video did not capture the search of the third-row seat, but Officer Jackson testified at the hearing that he opened a box that was covered in birthday wrapping and found "heat-sealed pressed packages." Mot. Hr'g Tr. at 50:5-8. The officer testified that he suspected these packages contained narcotics because in his experience, it is common for individuals who are transporting narcotics to heat seal the packages to stop any odor from escaping. *Id.* at 50:8-24.

Once he discovered the packages, Officer Jackson abruptly walked away from the vehicle, drew his firearm and began to yell out commands to Hyler-Williams and Berry for them to "get on the fucking ground!" DC at 20:45. The officer then placed both men in custody, read them their rights, searched their pockets, and placed them in his police vehicle. *Id.* at 20:45 -23:25. The heat-sealed packages were later found to contain approximately 962 grams of methamphetamine, 2.8 kilograms of blue M30 fentanyl pills, and 1.04 kilograms of powdered fentanyl. (Doc. 91 at 6).

Defendant Berry now moves for the Court to suppress "the controlled substances found as a result of the unconstitutional seizure, detainment, and search on August 1, 2023." (Doc. 85 at 1). Defendants' joint motion asks the Court to "suppress all evidence and statements obtained as a result of the illegal seizure and search." (Doc. 84 at 1). Each Defendant has joined the other's motion. (Doc. 84 at 1; Doc. 85 at 1). The Government opposes both motions. (Doc. 91 at 16).

## II.
## LEGAL STANDARDS

The Fourth Amendment guarantees a person's right to be free from "unreasonable searches and seizures." U.S. CONST. amend. IV. The exclusionary rule prohibits introduction of evidence directly obtained by a violation of the Fourth Amendment and evidence that is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate

6

the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.").

A defendant may move to suppress evidence that is "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 488. To prevail, a defendant must first "demonstrate that his Fourth Amendment Rights were violated." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006), *cert. denied*, 550 U.S. 949 (2007). Then, he must show "a factual nexus between the illegality and the challenged evidence." *Id.* (citation omitted). "In order for a defendant to meet his burden of showing a factual nexus, he must, [a]t a minimum . . . adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light *but for* the government's unconstitutional conduct [directed toward that complaining defendant]." *United States v. Ladeaux*, 454 F.3d 1107, 1111 (10th Cir. 2006) (alterations in original; citation omitted).

Once a defendant makes these showings, the government must "prove that the evidence sought to be suppressed is not fruit of the poisonous tree." *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014) (internal quotation marks and citation omitted). "When a motion to suppress involves a warrantless search, 'the government has the burden of proving its warrantless actions were justified.'" *United States v. Jacobo-Rosas*, 625 F. Supp. 3d 1174, 1188 (D.N.M. 2022) (quoting *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020)).

In presiding over a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265.

## III.
## DISCUSSION

**A. Whether the Traffic Stop Was Justified by Reasonable Suspicion of a Traffic Law Violation.**

The first question before the Court is whether the traffic stop of Defendants was justified at its inception because Defendants argue that Officer Jackson did not have reasonable suspicion to conduct a stop of the Wagoneer occupied by Defendants. (Doc. 85 at 6). The Government responds that the stop was proper because Officer Jackson had reasonable suspicion of three crimes: speeding, following too closely, and driving an unregistered vehicle. (Doc. 91 at 7).

"A traffic stop is a seizure within the meaning of the Fourth Amendment," and courts "analyze such stops under the principles pertaining to investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc); *accord United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011). "To be reasonable, a traffic stop must be (1) justified at its inception and (2) officers' 'actions during the stop must be reasonably related in scope to the mission of the stop.'" *Jacobo-Rosas*, 625 F. Supp. 3d at 1189 (quoting, in part, *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020)); *see also United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013).

A traffic stop is justified at its inception when the officer has "reasonable suspicion – that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *United States v. Gomez-Arzate*, 981 F.3d 832, 838 (10th Cir. 2020) (citation omitted). Typically, a traffic stop is justified if the officer observes or reasonably suspects a traffic or equipment violation. *See Botero-Ospina*, 71 F.3d at 787. An observed traffic violation "afford[s] the quantum of individualized suspicion necessary to ensure that police discretion is sufficiently constrained." *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009).

A police officer may also stop a vehicle if the officer has "a reasonable suspicion that [other] criminal activity may be afoot." *United States v. Whitley*, 680 F.3d 1227, 1233 (10th Cir. 2012). "For reasonable suspicion to exist, an officer must 'articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Whether an investigative detention is supported by reasonable suspicion 'does not depend upon any one factor, but on the totality of the circumstances.'" *Id.* (quoting *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)). The government bears "the burden before the district court of establishing by a preponderance of the evidence that reasonable suspicion supported the officer's stop of [a] vehicle." *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012).

The issue regarding the traffic stop conducted by Officer Jackson was the subject of dispute almost immediately after the Defendants were indicted on the federal charges brought against them. The litigation on that matter began due to information in the Criminal Complaint indicating that Officer Jackson initiated the stop after he observed the Wagoneer traveling eight miles per hour over the posted speed limit and then ran a records check on the vehicle's registration which returned, "No Record/Not on File." (Doc. 2, ¶ 11). At that time, according to the Complaint, Officer Jackson activated his emergency lights and conducted the traffic stop. *Id.*

Defendant Berry, knowing that the vehicle he and Hyler-Williams were traveling in was a rental car validly registered through Enterprise Rent-A-Car, believed that the purported records check for the registration did not occur and that the stop of the vehicle was improper and not justified. According to Berry, he sought information from the BIA that would show how and to whom Officer Jackson communicated his request for a registration records check, but was informed by Officer Lyle Benally, BIA Acting Regional Agent in Charge, that BIA officers did

not have typical "CAD" records which detailed communications between officers and dispatch, but instead communicated with each other and dispatch via text message. (Doc. 29). Later, Agent Benally issued a Memorandum stating that Officer Jackson had communicated with the Cibola County Dispatch Center about the traffic stop in question. (Doc. 55-2). After significant litigation on the issue of the stop, including the issuance of subpoenas for text messages and Cibola County records, a motion to quash a subpoena, a motion to show cause, and hearings on the matter, it became clear that neither of the two explanations from the BIA regarding Officer Jackson's registration records check were true. (Docs. 38, 41, 42, 49, 54, 55, 60, 61, 72, 73). At the evidentiary hearing on the current Motion, Officer Jackson testified that, before stopping the vehicle, he ran a registration query on the Wagoneer using the National Crime Information Center ("NCIC") database and that his query returned information from the state of Indiana that there was no registration on file for that vehicle. Mot. Hr'g Tr. at 25:19-26:19. The officer conceded, however, that once he stopped the vehicle, Defendant Berry provided him a rental agreement for the vehicle and proof that it was validly registered. *Id.* at 84:13-19. The explanation provided by Officer Jackson as to how the NCIC indicated there was no record on a vehicle that was validly registered was that Indiana uses special codes for different categories of license plates and that if the wrong code is used while running a registration check, the return could be inaccurate. *Id.* at 31:10-23.

But as to whether he used text messaging to make the registration inquiry on the Wagoneer or communicated with Cibola County dispatch to run the registration check, Officer Jackson categorically denied this was the case. Regarding the use of text messages to run registration inquiries, Officer Jackson repudiated what the BIA Regional Agent in Charge had informed the defense, stating, "That's not accurate. That's not even possible." Mot. Hr'g Tr. at 77:19-24. In

direct contradiction to the BIA Memorandum authored by the same BIA Regional Agent in Charge, Officer Jackson also denied that he had run a records check through Cibola County Dispatch and stated that Cibola County Dispatch did not give him any information about the Wagoneer's registration. Mot. Hr'g Tr. at 78:9-79:10. To further confuse the issue, in its response to the instant Motion, the Government provided yet another explanation for how the registration check resulted in no record for a vehicle when in fact the vehicle was validly registered. As stated by the Government, "As it turns out, Indiana does not respond to out of state records requests, so when a New Mexico police officer checks their computer regarding an Indiana-registered vehicle, they will always receive a "No Record" result. (Doc. 91 at 10).

The conflicting and changing explanations for whether and how Officer Jackson ran a registration check on the vehicle driven by Defendants and why such a check would have come back as stating there was no valid registration, when in fact there was, causes the Court concern. Given the varying information regarding the registration check, it is clear that someone representing the BIA – either Agent Benally, Officer Jackson, or counsel for both, has provided both the defense and this Court inaccurate and untruthful information about how the registration check was allegedly conducted. Whether providing that misinformation was intentional is not known, but the Court finds that due to the evolving descriptions of the actions taken by Officer Jackson, none of the information provided by the Government on this issue is reliable.

As to the alleged speeding and following too close to another vehicle, Defendants argue that the Court should not credit Officer Jackson's testimony on these issues because the video evidence of the stop contradicts Officer Jackson's testimony regarding his observations of the Wagoneer following too closely to the vehicle in front of it and there is no corroboration of his testimony that he saw the Wagoneer speeding. The Court, however, declines to determine whether

the stop of Defendants was justified by any of the reasons stated by the BIA and Officer Jackson because the Court finds, as discussed more fully below, that Defendants' Fourth Amendment rights were violated by the unlawful extension of their detention and the warrantless search of the vehicle in which they traveled.

**B. Even if Initially Justified, the Traffic Stop Was Unreasonably and Unconstitutionally Extended by Officer Jackson and There Was No Probable Cause to Search the Vehicle.**

The more prominent issue the Court must address is whether, even if the traffic stop itself was justified, Officer Jackson unlawfully extended the stop of the Defendants beyond its original purpose and whether he had probable cause to conduct a search of the vehicle. (Doc. 85 at 8-10; Doc. 91 at 10-13). Defendants argue that the purpose of Officer Jackson's stop ended when he issued a warning to Hyler-Williams and Defendant signed it. (Doc. 84 at 6). At that point, contend Defendants, the traffic stop was over and there was no legitimate reason to continue to detain Defendants because Officer Jackson had no reasonable suspicion to believe that drugs would be found in the vehicle and the stop at no point became consensual. *Id.*

The Government, however, takes the position that the stop was not unreasonably extended beyond the issuance of the warning because Officer Jackson had reasonable suspicion to believe that Defendants were trafficking marijuana based on his detection of the smell of marijuana coming from the front passenger window. That detection, argues Defendant, provided not only reasonable suspicion to extend the stop, but probable cause to search the vehicle.

**1. The law regarding the duration of traffic stop detentions and the warrantless searches of vehicles.**

The Government agrees that pursuant to the Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. 348, 355 (2015), an officer cannot extend a traffic stop beyond the time reasonably related to the purpose of the stop "absent reasonable suspicion ordinarily demanded to

justify investigative detention." (Doc. 91 at 10). "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). "It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). An officer may also ask about the driver's travel plans, *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001), and ask about matters unrelated to the stop if those questions do not prolong the length of the detention. *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007); *see also United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) ("An officer may conduct certain unrelated inquiries during the stop, but he may not do so in a way that prolongs it absent the reasonable suspicion ordinarily required to detain an individual.") (citing *Rodriguez*, 575 U.S. at 355).

However, pursuant to the Fourth Amendment, an officer's authority to seize the occupants of a vehicle ends when "tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez*, 575 U.S. at 354. In fact, an individual "may not be detained *even momentarily* without reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 498 (emphasis added). "A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Rodriguez,* 575 U.S. at 350-351 (alteration in original; internal quotation marks and citations omitted). An officer may not constitutionally prolong a stop beyond that point except where (1) the encounter becomes consensual or (2) during the stop, the officer develops reasonable suspicion that the detained person is engaged in other criminal activity.

*See United States v. Cortez*, 965 F.3d 827, 833-34 (10th Cir. 2020) (citing *Pettit*, 785 F.3d at 1379); *see also Moore*, 795 F.3d at 1229.

"Under the automobile exception to the Fourth Amendment's warrant requirement, police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023) (quoting *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (internal quotations and citations omitted). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* (quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001).

**2. Officer Jackson had no reasonable suspicion to extend the traffic stop beyond the time it took him to issue a written warning to Defendants and no probable cause to search the Wagoneer.**

In this case, there is no dispute that, approximately 13 minutes after Officer Jackson initiated the stop of the Wagoneer driven by Defendants, he issued Defendant Hyler-Williams a warning for speeding and following too close to another vehicle and Hyler-Williams signed the warning. DC at 12:30-13:00. At that point, the mission of the stop was complete and, absent consent or additional reasonable suspicion or probable cause, any further detention of Defendants was unlawful, *see Rodriguez*, 575 U.S. at 355, a point that the Government appears to concede. (Doc. 91 at 11) ("The traffic stop was arguably complete at that time, because Mr. Hyler-Williams was free to go." ). The Government does not contend that in this case the detention of Defendants became a consensual encounter at any point, but nevertheless argues that Officer Jackson did not unreasonably prolong the detention of Defendants because he had reasonable suspicion to believe a crime was being committed. According to the Government, "while speaking to Defendants from the front passenger-side window of the Wagoneer, Officer Jackson smelled the odor of both burnt

and unburnt marijuana coming from the vehicle, which created both probable cause to search the vehicle and reasonable suspicion justifying further detention of the vehicle and occupants for investigation." (Doc. 91 at 10-11). Indeed, at the Motion Hearing, Officer Jackson testified that when he first pulled over the Wagoneer and got to the passenger window, he detected, through his training and experience, the "odor of burnt and unburnt marijuana emitting from the vehicle." Mot. Hr'g Tr. at 37:23-38:3; *see also id.* at 57:17-20 ("when the window comes down, [the marijuana odor] is very evident."). He testified that he specifically detected the "chemical odor portion of marijuana when it's ready to be eaten or smoked or [consumed]" and the odor of burnt marijuana. *Id.* at 38:24-39:2.

The question the Court must answer is whether Officer Jackson's testimony that he had smelled both burnt and unburnt marijuana emanating from the vehicle's front passenger window when he first approached the vehicle can be credited. This is so because the smell of either form of marijuana from a vehicle can establish probable cause to search a vehicle under the belief that the occupants are engaged in the trafficking of marijuana. *See United States v. Downs*, 151 F.3d 1302 (10th Cir. 1998); *see also United States v. Nielsen*, 9 F.3d 1487, 1490 (10th Cir. 1993) (holding that the odor of burnt marijuana may satisfy the probable cause requirement to search the passenger compartment of a vehicle); *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991) (holding that the odor of raw or unburnt marijuana may establish probable cause for a more expansive search). Thus, if Officer Jackson detected such a smell before he completed the mission and purpose of the stop, he likely had reasonable suspicion to extend the traffic stop once he completed its purpose as well as probable cause to search the vehicle. *See Cortez*, 965 F.3d at 833.

After careful consideration of the evidence presented at the hearing on this Motion, including witness testimony and the video evidence from Officer Jackson's dashboard camera, the

Court finds that it cannot credit Officer Jackson's statements concerning his observations when he first approached the Wagoneer, including his statements regarding the smell of both burnt and unburnt marijuana emitting from the passenger window. There are several reasons for the Court's determination. First, the Court cannot reconcile Officer Jackson's testimony with the video evidence in this case. Officer Jackson testified at the hearing that, as he initially approached the vehicle, he made several specific observations which he found suspicious. Most significantly, Officer Jackson testified that he noticed that in the rear cargo area of the Wagoneer there was just one suitcase with wheels, and in the third row of the vehicle there was a box with birthday wrapping. Mot. Hr'g. Tr. at 36:22-37:3. According to Officer Jackson, this was interesting to him because, in his opinion, it was not normal for two occupants to have just one suitcase. *Id.* at 37:17-19.

The dash camera video recording, however, does not support Officer Jackson's contention that he was able to view these items when he first approached the vehicle, and instead calls into question the veracity of his statements regarding the observations he made at the scene. The video recording, which the Court reviewed several times both prior to and after the Motion Hearing, unequivocally shows that as Officer Jackson walked up to the passenger side of the Wagoneer, which had heavily tinted windows, he only glanced toward the vehicle's rear passenger side door for no more than a fraction of a second from at least a foot and a half away from the vehicle. DC at 1:26. The Court does not question that Officer Jackson is an experienced and trained officer, but to be able to view a suitcase in the rear hatch area of the vehicle and a wrapped gift box in the third-row passenger seat in that miniscule amount of time, without peering in through the tinted windows or even looking in the direction of the rear hatch area of the Wagoneer, would require capabilities beyond that of an ordinary human being. The Court cannot and will not set aside the

problematic nature of the officer's testimony on this issue and gives it great weight in determining the reliability and accuracy of the remaining statements regarding what the officer observed at the scene.[3] *See United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004) ("The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court.").

Second, the Court must question Officer Jackson's statement that, as he stood outside the vehicle, he smelled both "burnt" and "unburnt" marijuana coming from the passenger side window of the Wagoneer shortly after he initiated the stop of the vehicle. Although no expert testimony or scientific evidence was presented by the parties regarding whether the average human being, or even a well-trained and experienced law enforcement officer, could credibly smell and recognize both "burnt" and "unburnt" marijuana at the same time coming from the same place, the Court finds it difficult to accept such a proposition under the circumstances here. Although Officer Jackson explained that through his training and experience, he knew that raw marijuana is "marijuana that is not burnt yet but is ready for smoking or eating," and that he had smelled burnt marijuana during his training and raw marijuana in the field, he did not testify that he was specially trained or somehow adept at using his sense of smell to detect both the pungent aroma of raw marijuana and burnt marijuana at the same time from the same area and to be able to differentiate between the two. Mot. Hr'g Tr. at 38:7-12, 108:6-109:8. To borrow a rationale from the Tenth Circuit, "[i]f this were a case of an alert by a trained drug sniffing canine with a good record," the issue of probable cause might be different. *Nielsen*, 9 F.3d at 1491. "But for a human sniffer, an

---

[3] At the Motion Hearing, the Court, being familiar with the dash camera recording showing that Officer Jackson never looked in or toward the rear cargo area as he approached the front passenger window of the vehicle, directly asked the officer whether his testimony was that he saw what was in the rear cargo area as he initially approached the Wagoneer. Despite the video recording contradicting that contention, Officer Jackson responded, "Yes sir." Mot. Hr'g Tr. at 37:4-16.

officer with an incentive to find evidence of illegal activities and to justify his actions when he had searched without consent, [ ] constitutional rights are endangered if limitations are not imposed." *Id.*

Third, even though Officer Jackson thoroughly searched the Wagoneer after Defendants declined to give their consent to search, nothing was found that corroborated the officer's detection of burnt marijuana or credibly corroborated the smell of unburnt or raw marijuana. *See id.* at 1491 (noting that in all the cases from the Tenth Circuit prior to that decision, the search of a vehicle itself established the validity of the smell of marijuana as marijuana was found in the area it would be expected to be found). There is nothing in the record that indicates the officer located any of the usual modes of paraphernalia used to smoke marijuana – no pipe, no rolling papers, and no half-burned marijuana cigarette, either in the vehicle or in the possession of Defendants – raising the question whether Officer Jackson did indeed detect such a smell. As to the smell of unburnt marijuana, the officer testified that he later found "some personal marijuana" in the front of the vehicle, after the primary search had been conducted. Mot. Hr'g Tr. at 53:12-13. On cross-examination, however, the officer confirmed that the amount found was inside the console of the Wagoneer, wrapped in a plastic baggie that was tied shut, and was the size of a grape, *id.* at 107:18-108:5 – hardly the amount of unburnt marijuana that one would imagine could emit an odor detectable by a human sniffer standing outside the vehicle through its plastic wrapping and the console. And certainly not akin to the amounts of unburnt marijuana that were found to emit an overwhelming or strong odor sufficient to establish probable cause to search in other cases from the Tenth Circuit. *See Downs*, 151 F.3d at 1303 (affirming the denial of a motion to suppress 200 pounds of marijuana found in the defendant's vehicle and explaining that "[w]hen . . . an officer encounters . . . the overpowering smell of raw marijuana, there is a fair probability that the car is

18

being used to transport large quantities of marijuana and that the marijuana has been secreted in places other than the passenger compartment."); *Morin*, 949 F.2d at 300 (affirming the denial of a motion to suppress in part because an officer detected a "strong odor of marijuana" discovered to be 42 pounds of unburnt marijuana); *United States v. Ashby*, 864 F.2d 690, 692 (10th Cir. 1988) (finding probable cause to search a trunk based in part on "the odor which sixty-eight pounds of partially unwrapped marijuana may emit.").

### 3. The totality of the circumstances weighs against reasonable suspicion and probable cause based on the alleged smell of marijuana.

Finally, other factors in the totality of the circumstances convince the Court that it cannot make the factual determination that Officer Jackson smelled marijuana coming from the car and therefore had reasonable suspicion to extend the stop beyond the issuance of the warning and probable cause to search the vehicle in question. For one, even though Officer Jackson testified that he smelled the marijuana from the front passenger side window when he approached to speak with the occupants of the Wagoneer, *see* Mot. Hr'g Tr. at 37:22-38:3, he did not begin his search of the vehicle in the most obvious place where marijuana would be found given the area where the smell came from – the front passenger area of the vehicle. Instead, after he was unable to obtain consent for the search, Officer Jackson ordered both Defendants to stand on the side of the road and then immediately went to the far rear of the Wagoneer, unlocked and then opened the rear hatch area of the vehicle, and began searching the suitcase and bags that were located there as well as using a tool to pry back the plastic trim of the rear hatch door. DC at 16:40. The Court is not suggesting that there is or was a requirement that the search of a vehicle for drugs begin in any particular place or in any particular fashion, but finds that the facts here indicate Officer Jackson

was not interested in finding the marijuana he claimed he smelled in the front of the Wagoneer, but instead may have been interested in the types of drugs he eventually discovered in the vehicle.[4]

The Court also cannot ignore that Officer Jackson apparently had a drug-sniffing canine with him in the police vehicle during the encounter with Defendants, which can be heard on the dash camera recording barking intermittently throughout the time it took Officer Jackson to issue Defendants the traffic warning. The officer did not, however, use the canine to detect the smell of drugs or to confirm his alleged detection of the smell of marijuana prior to conducting a warrantless search of the Wagoneer. Mot. Hr'g Tr. 99:4-6. When asked at the Motion Hearing whether he used the canine to sniff the vehicle, Officer Jackson responded, "No, ma'am. My dog isn't needed at this point." *Id.* at 102:20-22. Given the contradictions between what the officer stated he observed at the scene and the events captured by the officer's dashboard camera, as well as the questions raised by the officer's contention that he smelled both burnt and unburnt marijuana coming from the front of the vehicle, which ultimately was not fully corroborated, the Court can only surmise that the officer may not have used the canine because he was concerned it would not alert to drugs.

In sum, the Court cannot and does not credit the testimony of Officer Jackson that, upon first approaching the vehicle occupied by Hyler-Williams and Berry, he viewed a suitcase in the rear hatch area, a wrapped box in the third-row seat, and smelled both burnt and unburnt marijuana emanating from the front passenger window of the vehicle.

---

[4] There is no question that fentanyl and methamphetamine are dangerous drugs and that law enforcement officials are tasked with the important duty of preventing this type of contraband from entering our communities. *See United States v. Bolivar*, 455 F. Supp. 3d 1165, 1171 (D.N.M. 2020) (describing "the lethality of fentanyl and scourge of methamphetamines and opioids on this community."). But such objectives, no matter how righteous, cannot justify the violation of an individual's right to be free from unreasonable searches and seizures guaranteed under the Fourth Amendment.

**4. The other observations made by Officer Jackson did not establish reasonable suspicion to extend the traffic stop beyond the issuance of the written warning or establish probable cause.**

The Government also elicited testimony from Officer Jackson regarding other observations he made which purportedly contributed to his suspicion that marijuana was being illegally transported in the vehicle occupied by Defendants. Officer Jackson testified, for instance, that he found interesting the fact that Defendants refused to consent to a search of their belongings even though Hyler-Williams had stated "he had smoked marijuana in Phoenix and he wasn't in possession of any more marijuana." Mot. Hr'g Tr. at 60:14-16. As further explained by the officer, "It was interesting to me because most individuals who are not involved in criminal activity would grant me consent to search their belongings to confirm or to defer my suspicions that there's no more marijuana in the vehicle." *Id.* at 61:15-18.

The Court is troubled by the officer's testimony that he considered Hyler-Williams' refusal to consent to the warrantless search a reason to suspect illegal activity. Individuals have a constitutional right to refuse consent to a search, and the existence of this right necessarily requires that denial of consent not be a basis for reasonable suspicion or probable cause. *See United States v. Santos*, 403 F.3d 1120, 1125–26 (10th Cir. 2005). As observed by the Tenth Circuit, "it should go without saying that consideration of such a refusal [of consent] would violate the Fourth Amendment." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997). "If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections." *Santos*, 403 F.3d at 1126; *see also Gasho v. United States*, 39 F.3d 1420, 1431 (9th Cir. 1994) ("The Fourth Amendment gives citizens the right to refuse to consent to warrantless searches and seizures."). The fact that Officer Jackson considered Defendant's refusal of consent to the

warrantless search a reason to suspect illegal activity weighs in favor of finding that he did not have reasonable suspicion to extend the traffic stop or probable cause to search the vehicle.

At the Motion Hearing, the Government also elicited testimony from Officer Jackson regarding Hyler-Williams' statements that he had smoked marijuana in Arizona and testimony about how the officer found it unusual that Hyler-Williams claimed to only have a bag of clothes and no luggage. Neither of these observations, however, whether viewed independently or in the aggregate, could have formed the reasonable suspicion Officer Jackson needed to extend the stop beyond the point at which he completed the issuance of the written traffic warning. This is because reasonable suspicion required to extend a completed traffic stop must be obtained or developed during the pendency of the lawful stop, not after the stop is unlawfully extended. "Continued detention is lawful only if the encounter becomes consensual or if, *during the initial lawful traffic stop*, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity." *Pettit*, 785 F.3d at 1379 (emphasis added; citation omitted).

Here, the record establishes, and the Court finds, that the mission of the stop was completed when Officer Jackson issued the written warning to Hyler-Williams and Hyler-Williams accepted it and signed it. DC at 12:55-13:00. Thereafter, Officer Jackson began to ask questions unrelated to the reason he claimed he stopped the vehicle. D.C. at 13:00. This constituted what has been described as the "*Rodriguez* moment," i.e., "the moment when the officer extended the stop by engaging in non-traffic inquiries." *Frazier*, 30 F.4th at 1179. The question then becomes "whether the facts known to him at that moment established reasonable suspicion" because " [f]acts learned later in the investigation are irrelevant." *Id.*

The dash camera video recording shows that it was only after the *Rodriguez* moment in this case, when the stop had become an unlawful detention,[5] that Officer Jackson learned Hyler-Williams had smoked marijuana in Arizona and that he had only a plastic bag of clothes. DC at 13:00-13:54; 14:32-14:52. These are not facts that Officer Jackson learned during the pendency of the lawful stop and therefore are irrelevant to the determination of reasonable suspicion and probable cause. *See Pettit*, 785 F.3d at 1379. Officer Jackson also testified that one of the contributing factors to his suspicion that Defendants were committing a crime was the "conflicting travel plans in their stories." Mot. Hr'g Tr. 65:6-10. According to the officer, Hyler-Williams told him he was only in Arizona for a few days while Berry stated he was there for a week. *Id*. The dash camera recording, however, demonstrates that, prior to the search of the Wagoneer, Officer Jackson did not ask Hyler-Williams how long they had been in Arizona and Hyler-Williams did not volunteer that information, *see* DC, *passim*, demonstrating another discrepancy between the officer's testimony and the recorded evidence from the scene.

Considering all the above, the Court finds that Officer Jackson did not have the reasonable suspicion necessary to extend the stop beyond the time when he completed the issuance of the warning to Defendants and no probable cause to search the Wagoneer, thus both the extended detention and subsequent search of the vehicle were unconstitutional.

---

[5] *See Frazier*, 30 F.4th at 1179 ("[W]e we read *Rodriguez* as holding that when reasonable suspicion is lacking at the '*Rodriguez* moment,' seizure of the individual remains illegal from that point forward.") (citing *Rodriguez*, 575 U.S. at 355).

C. **The Evidence Sought to Be Suppressed Would Not Have Come to Light *But For* the Unconstitutional Extension of the Traffic Stop and the Unconstitutional Search**.

Defendants move to suppress "the narcotics found as a result of the unlawful seizure and search." (Doc. 85 at 16). Having demonstrated that their Fourth Amendment Rights were violated, Defendants must establish a factual nexus between the unconstitutional conduct and the evidence sought to be suppressed. *See Torres-Castro*, 470 F.3d at 999. The record here shows that, absent the unconstitutional detention and vehicle search by Officer Jackson, the evidence sought to be suppressed, i.e., the quantity of fentanyl and methamphetamine found in the third-row seat of the Wagoneer in a wrapped box, would not have been discovered by Officer Jackson. Upon the completion of the mission of the stop, both Berry and Hyler-Williams would have been free to leave the scene as there was no reasonable suspicion to extend their detention for investigative purposes. *See Rodriguez*, 575 U.S. at 354; *Royer*, 460 U.S at 498. Because Defendants have made the requisite showing of unconstitutional conduct leading to evidence that would not otherwise have come to light, it is incumbent upon the Government to prove that the drugs sought to be suppressed are not fruit of the poisonous tree. *See Mosley*, 743 F.3d at 1323. However, other than disputing the Defendants' allegations that the stop was unlawfully extended and that the search was unconstitutional, the Government provides no evidence or even argument that the drugs found in the Defendants' vehicle would have been discovered regardless of the conduct that the Court has found violated the Fourth Amendment. The evidence must thus be suppressed.

## IV.
## CONCLUSION

After careful consideration of all the evidence presented to the Court, and making the appropriate credibility determinations regarding the witness testimony presented at the Motion Hearing, the Court finds that the traffic stop of the vehicle driven by Mr. Hyler-Williams was

unreasonably and unlawfully extended beyond the time the mission of the stop was or should have been completed. Based on the facts determined by the Court, Officer Jackson had no reasonable suspicion to cause such an extension or probable cause to search the vehicle, and the Government has failed to meet its burden to show that the extension of the stop was otherwise justified. The Court also concludes that, but for the unlawful conduct described herein, the contraband in Defendants' vehicle would not have been discovered. Pursuant to the exclusionary rule of the Fourth Amendment, the evidence discovered as a result of the search must thus be excluded.

For the foregoing reasons, the Court **GRANTS** Defendants' Joint Opposed Motion to Suppress (Doc. 84) and **GRANTS** Defendant Leo Berry's Motion to Suppress Evidence (Doc. 85).

**IT IS SO ORDERED.**

_____
DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

25